# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROBIN D. JONES, | ) |
| | ) |
|       **Plaintiff,** | ) |
| | ) |
| v. | )   Case No. 16-CV-0049-CVE-FHM |
| | ) |
| MEGAN J. BRENNAN, | ) |
| Postmaster General, | ) |
| | ) |
|       **Defendant.** | ) |

## OPINION AND ORDER

Now before the Court is defendant Megan J. Brennan's motion for summary judgment (Dkt. # 50).

This is an employment discrimination case arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (Title VII), the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (Rehabilitation Act). The questions presented are whether defendant Megan J. Brennan, Postmaster General, discriminated against plaintiff Robin D. Jones, a United States Postal Service (USPS) employee, on the basis of her pregnancy, or retaliated against her for seeking an accommodation.

# I.

The following facts are undisputed:[1] plaintiff has worked for defendant since January 31, 1998. Dkt. # 50-1, at 7. For the last "nine or ten" years, she has worked primarily in the "custodial craft" at various USPS offices in Tulsa, Oklahoma, and, for the past "couple of years," she has worked mostly at 333 West 4th street in Tulsa (the downtown station). Id. at 8-12. As a custodian, her duties include cleaning, sweeping, pulling trash, dusting, and mopping, stripping, and waxing floors. Id. at 10. In cleaning restrooms and stripping floors, she is required to work with chemicals. Id. at 108.

On or about July 17, 2014, at plaintiff's request, defendant assigned her to the Sheridan Tulsa Post Office (the Sheridan station) as a "204B" temporary supervisor. Dkt. # 50-3. A 204B is an assignment pursuant to which an employee works as an interim manager. Dkt. # 50-2, at 10. Defendant assigns 204B supervisors when, for instance, a full-time supervisor is on long-term

---

[1] In her response to defendant's motion for summary judgment, plaintiff includes a "Response to Defendant's (Purportedly) Undisputed Facts" (Dkt. # 55, at 12-16). It controverts many of the facts defendant sets forth in her Statement of Undisputed Facts (Dkt. # 50, at 7-12), but fails to refer to the record. Local Civil Rule 56.1(c) provides,

> The response brief in opposition to a motion for summary judgment . . . shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed. All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.

Accordingly, because plaintiff fails to refer to the record in controverting the facts that defendant sets forth in its statement of undisputed facts, the Court deems these facts admitted.

disability, or there is a vacancy for a supervisory position that has yet to be filled. Id. Either defendant or the employee can terminate a 204B assignment at will. Dkt. # 50-1, at 52. In effectuating a 204B assignment, the employee must sign Postal Service Form 1723, Assignment Order (form 1723), and, if the employee's 204B assignment exceeds 180 days, the employee must sign a renewed form 1723. Dkt. # 50-4.

Also in July 2014, defendant and the American Postal Workers Union, AFL-CIO (the Union) entered into an agreement referred to as MS-47 TL-5 Implementation and Maintenance Craft PSE Conversions (MS 47). Dkt. # 50-11, at 1. The agreement provided that each of defendant's facilities had to work its custodians for at least ninety percent of the hours that the collective bargaining agreement stated custodians must work, or pay to custodians a penalty at the overtime rate for each hour short of the ninety percent threshold. Id.

In or around November 2014, while working as a 204B supervisor at the Sheridan station, plaintiff's doctor informed her that she was pregnant and, because her first pregnancy resulted in a premature birth, that her pregnancy was high-risk. Dkt. # 50-1, at 41. Plaintiff immediately told her supervisor at the Sheridan Station, Jeffrey Bailey. Id. at 44. At Bailey's suggestion, she then advised Jeffrey Callison, manager of customer service operations for ten postal stations in Tulsa (including the Sheridan and downtown stations), that she was pregnant (plaintiff testified that she cannot recall whether she specified to Callison that her pregnancy was high-risk). Id. at 48. Plaintiff did not feel that her pregnancy would affect her ability to fulfill her duties as a 204B supervisor, and neither Bailey nor Callison expressed concern in this regard or asked her for documentation. Id. at 45. Accordingly, on or about December 18, 2014, plaintiff signed a second form 1723, which renewed her 204B assignment and listed an end date of June 30, 2015. Dkt # 50-4.

3

On December 30, 2014, Callison emailed the supervisors (including Bailey) of the ten stations he managed to tell them that, for fiscal year 2015, their stations were a combined 1100 hours below the MS 47 ninety percent threshold for custodial hours worked. Dkt. # 50-5. In particular, the downtown station was 598 hours below its ninety percent threshold . Id.

On or about February 13, 2015, Callison informed plaintiff that her 204B assignment was terminated and she was to report back to the downtown station to resume her work as a custodian. Dkt. # 50-1, at 56. At that time, according to Callison, the stations he oversaw had a total of "four or five" 204B acting supervisors, and, of them, plaintiff was the only custodian. Dkt. # 50-2, at 17; Dkt. # 50-6, at 244. Also at that time, Callison further stated, a full-time supervisor who had previously worked at the Sheridan station wanted to transfer back there, and Callison was able to employ only a "limited [amount]" of supervisors in Tulsa at one time. Id. Finally, according to Bailey, also around early February 2015, he informed Callison that Jones's performance as a 204B supervisor was "unsatisfactory," as she was often "tardy" and "exhibited timidity" in correcting poor performance of the employees whom she was assigned to manage. Dkt. # 50-6, at 274-75. Bailey stated further that he discussed these issues with plaintiff "as they arose" from December 2014 through February 2015, but plaintiff denies that Bailey ever "came to her" with any concerns about her performance. Id.; Dkt. # 50-1, at 35.

Complying with Callison's instruction, plaintiff returned to work at the downtown station on February 17, 2015. Id. at 66. Upon encountering her manager, Andrew Jones, she informed him that she had a high-risk pregnancy and stated that, out of concern for her baby, she "wasn't sure the stipulations of what [she] could do, you know, the lifting, pushing, pulling, being around chemicals." Dkt. # 50-1, at 68. Jones asked if she had any documented medical restrictions, and plaintiff

4

answered in the negative, but added that she had a doctor's appointment the following week. Dkt. # 50-15, at 12-13; Dkt. # 50-1, at 68. In response, Jones directed plaintiff to, for the rest of that day, sit "up front"—i.e. at a customer-assistance desk by the entrance—away from the "chemicals and all that," and asked her to call her doctor's office to request that they fax documentation of her medical restrictions, which plaintiff did not succeed in doing. Dkt. # 50-15, at 13-16. In addition, Jones informed plaintiff that, if she felt performing her custodial duties was a threat to her baby and desired an alternative work arrangement, she would have to request "light duty and . . . get it approved through the postmaster . . . Kathy Ervin-Johnson." Id.[2] Defendant compensated plaintiff for her full eight hours of work that day. Dkt. # 50-8, at 1.

The next day, February 18, 2015, when plaintiff reported to work at the downtown station, she returned to the desk by the entrance where she worked the day before; she still did not have documentation for her medical restrictions. Dkt. # 50-1, at 79. That morning, Ervin-Johnson stopped to speak with plaintiff when she noticed her sitting near the entrance. Id. According to plaintiff, Ervin-Johnson asked her why she was not performing her custodial duties, and plaintiff explained that she had a high-risk pregnancy and felt that performing custodial work threatened her child's

---

[2]  Within defendant's organization, light duty is a "contractual term," "governed by Article 13 of most collective bargaining agreements," that "refers to temporary work assignments . . . requested by eligible employees who have impairments from non-job-related medical conditions." United States Postal Service Handbook EL–307, Reasonable Accommodation, An Interactive Process, § 542 (April 2017) (hereinafter Handbook EL–307), https://about.usps.com/handbooks/el307/el307c5_005.htm. On the other hand, "limited duty" refers to a "temporary assignment for an employee who is unable to perform the regularly assigned duties of his or her job due to an occupational illness." Id. Glossary. According to defendant, its limited duty policy is structured to comply with the Federal Employees Compensation ACT (FECA), 5 U.S.C. § 8101 et seq., which provides a "compensation mechanism for federal employees (much like workers' compensation) . . . injured in the performance of duty . . . ." Swafford v. United States, 998 F.2d 837, 841 (10th Cir. 1993).

5

safety. Id. Plaintiff stated further that Ervin-Johnson responded, "I had a high risk pregnancy too. And I was still capable of doing my job. Why can't you do yours?" Id. Ervin-Johnson, however, refutes plaintiff's account; she states that she told plaintiff she could "could identify with a high-risk pregnancy" because she previously had one and "assured [plaintiff] . . . that we didn't want to do anything to hurt her baby." Dkt. # 50-7. Ervin-Johnson stated further that, after her conversation with plaintiff, she said to Jones, "we needed some medical restrictions on [plaintiff] so we [do] not have to hear later that [plaintiff], or her baby, were injured in some way." Id.

About twenty minutes after plaintiff's conversation with Ervin-Johnson, Joy Franks, a supervisor at the downtown station, presented plaintiff with light duty paperwork. Dkt. # 50-1, at 80. According to plaintiff, Franks told her that she would "walk [her] off the clock" if plaintiff did not complete the light duty application. Dkt. # 50-1, at 80. Plaintiff responded, "I'm not a doctor. I can't say what my restrictions will be. And . . . I can't fill that paperwork out because if I do then I . . . would [be] falsifying information." Id. at 81. Plaintiff stated Franks then instructed her to retrieve her belongings and walked her off the premises. Id. at 86. Plaintiff informed her union steward, Charlie Mose, about this interaction. Dkt. # 50-1, at 93. For that day, defendant paid plaintiff for six hours of work and two hours of sick leave. Dkt. # 50-8, at 1.

On February 19, 20, 23, and 24, 2015, plaintiff did not report to work (February 21-22, 2015, were her previously scheduled days off). Dkt. # 50-8, at 1. During this period, defendant, on its own accord, paid her for eight hours of sick leave each day (although plaintiff never requested any type of leave), and plaintiff had no contact with defendant. Dkt. # 50-1, at 92-93.

On February 25, 2015, plaintiff returned to work at the downtown station with documented medical restrictions and a completed light duty application. Id. at 99. Plaintiff's medical restrictions

stated that she could "intermittently" stand or walk for no more than four hours per day, lift only up to twenty pounds "occasionally," and could not mop or work with chemicals. Dkt. # 50-9, at 1. In her light duty application, plaintiff stated that her "illness or injury" was pregnancy and that she was not injured on duty, and requested light duty "until delivery." Id. at 2. Defendant approved her light duty application that day; it assigned plaintiff to work as a custodian at the downtown station for four hours per day and excused her from mopping and handling chemicals. Dkt. # 50-1, at 104-107. In addition, through the efforts of Mose (her union steward), plaintiff obtained an additional four hours of sit-down work at defendant's mail-sorting plant in Tulsa (the plant). Dkt. # 50-10, at 6. Callison approved these additional hours, and, on March 4, 2015, plaintiff began working, within her restrictions, at the downtown station for four hours per day and the plant for four hours per day, for a total of eight hours per day. Dkt. # 50-6, at 251.[3]

Plaintiff remained on light duty until July 17, 2015, after which she took maternity leave. Dkt. # 50-8, at 3. On July 21, 2015, she requested 240 hours of advanced leave; defendant approved her request, and plaintiff used this leave until about October 1, 2015. Dkt. # 50-14. Thereafter, defendant placed plaintiff on leave without pay, under which she retained her medical insurance. Dkt. # 50-8, at 3. While on maternity leave, plaintiff incurred an overpayment from defendant and, when she discovered this, worked out a repayment plan with a human resources specialist to deduct $100 per pay check in order to reimburse defendant. Dkt. # 50-1, at 150-51. Ultimately, however, plaintiff's repayment rate increased to an unspecified amount when Ervin-Johnson signed a letter from the payroll office indicating that plaintiff owed defendant money. Dkt. # 50-20, at 8-9. On

---

[3] On the business days before she obtained the additional hours at the plant—i.e. February 25-27, 2015, and March 2-3, 2015—plaintiff worked for four hours per day at the downtown station, and defendant paid her for four hours of sick leave. Dkt. # 50-8.

March 7, 2016, plaintiff resumed her work as a custodian at the downtown station. Dkt. # 50-8, at 3.

On January 28, 2016, plaintiff filed this lawsuit, alleging discrimination and retaliation on the basis of race and gender in violation of Title VII, and failure to accommodate and retaliation in violation of the Rehabilitation Act. Dkt. # 1. Defendant moved to dismiss (Dkt. # 9) plaintiff's complaint, and the Court granted this motion in part, dismissing plaintiff's Title VII race discrimination and Rehabilitation Act claims (Dkt. # 16). Thereafter, plaintiff filed an amended complaint (Dkt. # 17), alleging discrimination and retaliation on the basis of gender under Title VII and retaliation under the Rehabilitation Act. Defendant filed a second motion to dismiss (Dkt. # 19), asking the Court to dismiss plaintiff's Rehabilitation Act claim, and the Court denied this motion (Dkt. # 30). Plaintiff then moved for leave to file a second amended complaint (Dkt. # 40), which the Court denied (Dkt. # 44). Defendant now moves for summary judgment (Dkt. # 50).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (quoting Fed. R. Civ. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." Id. at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant argues that it is entitled to summary judgment on plaintiff's discrimination and retaliation claims. Dkt. # 50. Plaintiff argues that fact issues for trial exist as to (1) whether, in processing her under its light duty accommodation policy as opposed to its limited duty policy,[4]

---

[4] See supra note 3 and accompanying text.

defendant subjected plaintiff to disparate treatment on the basis of her pregnancy in violation of Title VII and the PDA; and (2) whether defendant retaliated against her. Id. at 23-26.[5]

## A. Disparate Treatment

The PDA "makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." Young v. UPS, 135 S. Ct. 1338, 1344 (2015). Specifically, the PDA requires employers to treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Where, as here, a plaintiff relies on indirect evidence in an attempt to prove disparate treatment on the basis of pregnancy, courts must apply the following burden shifting framework that the Court announced in Young:

> First, a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA "may make out a prima facie case by showing . . . that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'
>
> The employer may then seek to justify its refusal to accommodate the plaintiff by relying on 'legitimate, nondiscriminatory' reasons for denying her accommodation . . . . But, consistent with the Act's basic objective, that reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ("similar in their ability or inability to work") whom the employer accommodates.

---

[5] Defendant also briefs the issue, raised in plaintiff's complaint, of whether pregnancy discrimination motivated adverse employment actions that plaintiff allegedly suffered. Dkt. # 17, at 12-13; Dkt. # 50, at 22-26. In her response (Dkt. # 55), however, plaintiff does not address this argument. The Court, therefore, presumes plaintiff has abandoned it and grants summary judgment on it in favor of defendant. See Hinsdale v. City of Liberal, Kansas, 19 Fed. App'x 749, 768-70 (10th Cir. 2001) (affirming district court's presumption that plaintiff abandoned an argument raised in his complaint where plaintiff did not address the argument in his response to defendant's motion for summary judgment) (this and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. R. 32.1; 10th Cir. R. 32.1.).

> If the employer offers an apparently 'legitimate, non-discriminatory' reason for its actions, the plaintiff may in turn show that the employer's proffered reasons are in fact pretextual. We believe that the plaintiff may reach a jury on this issue by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination.
>
> The plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers.

Id. at 1354. In addition, in dictum, the Court explicitly rejected the plaintiff's argument that the PDA requires a court, "whenever an employer accommodates only a subset of workers with disabling conditions," to find a "Title VII violation if pregnant workers who are similar in the ability to work do not receive the same [accommodation] even if still other non-pregnant workers do not receive accommodations." Id. at 1349 (emphasis added).

In an attempt to make out a prima facie case of disparate treatment on the basis of pregnancy, plaintiff characterizes defendant's limited duty policy, which applies to employees injured on the job, and light duty policy, which applies to employees—like plaintiff—who have restrictions because of an off-duty event, as "first class" and "second class" policies respectively. Dkt. # 55, at 17-19. In support of this characterization, plaintiff states that defendant's limited duty policy requires defendant to make "every effort to toward assigning the employee to limited duty . . . . consistent with . . . limitation tolerances," permits "limited duty outside of the work facility to which the employee is normally assigned," and allows qualifying employees to waive mandatory written test requirements for certain positions. Dkt. # 55, at 18; Dkt. # 55-22, at 2. By contrast, plaintiff states further, "the light duty accommodation policy suffers from the less favorable term of requiring

reduced work-hours within a person's craft before management can search for hours in another craft within the same installation." Dkt. # 55, at 19 (citing Dkt. 55-3, at 4).[6]

Having thus framed defendant's two disability accommodation policies, plaintiff argues that, because defendant processed her under its "second class" light duty policy, defendant stopped searching for hours for her once it granted her hours that were in her craft, at the facility where she normally worked, and within her medical restrictions—i.e. four hours of custodial work per day, with no mopping or chemical use, at the downtown station. Dkt. # 55, at 20. And, plaintiff argues further, but for her own efforts, in conjunction with her union steward, to obtain the additional four hours of sit-down work at the plant, defendant would have forced her to work for only four hours per day. Id. By contrast, plaintiff contends, had defendant processed her under its limited duty policy, defendant would have been required to "search for full-time hours, even in another craft and even at an outside installation." Dkt. # 55, at 20. Thus, plaintiff concludes, "because of the light duty policy's unfavorable term of permitting a reduction of hours," she "suffered a burden of being afforded only part-time work . . . ." Id.

Plaintiff fails to make out a prima facie case of disparate treatment under the PDA. Plaintiff was pregnant and did seek an accommodation. That much is true. But she cannot show that defendant did not accommodate her; it did. By March 4, 2015—nine days after plaintiff, on February

---

[6] As further evidence that defendant's light duty policy is inferior to its limited duty policy, plaintiff states, "[the light duty policy] makes a distinction between temporary and permanent disabilities, and workers classified within permanent disabilities are provided materially more favorable terms by arranging a system wherein the Defendant shall permit first full-time, then if nobody bids, part time flexible employees to bid into (essentially swap positions) the complement position." Dkt. # 55, at 19. This statement is incomprehensible, and in making it, plaintiff cites only to the light duty policy in general. Id. Accordingly, the Court does not factor this argument into its analysis.

12

25, 2015, submitted documented medical restrictions to defendant—she was working for defendant, within her restrictions, for eight hours per day. It is true that plaintiff's union steward, independently from plaintiff's supervisors, learned of the additional work at the plant. But the Court sees, and plaintiff provides, no reason that cooperation between plaintiff and defendant in the search for an optimal accommodation is somehow inappropriate.[7] Moreover, it was ultimately up to defendant to approve plaintiff's request to work at the plant, and defendant approved her request. Plaintiff, therefore, cannot show that defendant did not accommodate her. Rather, she can show only that defendant did not accommodate her in the exact fashion that she would have preferred. And the Court knows of no law that requires defendant to accommodate plaintiff precisely as she demands.[8]

---

[7] Indeed, employee participation in procuring an accommodation is expected, if not required, in other Title VII contexts. See, e.g., Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of Title VII's religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business"); Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1315-16 (10th Cir. 2017) ("To facilitate the reasonable accommodation, '[t]he federal regulations implementing the [Americans With Disabilities Act, 42 U.S.C. § 12112(a)] envision an interactive process that requires participation by both parties.'") (quoting Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004).

[8] Even assuming, arguendo, that defendant did deny plaintiff eight hours of work within her restrictions, to prove disparate treatment, plaintiff would have to establish that defendant's practice of accommodating workers injured on the job under the limited duty policy (which defendant does in order to comply with FECA), and accommodating workers injured off duty under the light duty policy, has led to defendant "accommodating a large percentage of non-pregnant workers while failing to accommodate a large percentage of pregnant workers." Young, 135 S. Ct. at 1354. And plaintiff provides no such evidence. In essence, plaintiff's argument is that defendant's practice of processing pregnant employees under the light duty policy violates the PDA because workers injured on the job who are similar in their ability to work are processed differently under the limited duty policy. But this is precisely the argument that the plaintiff made in Young and the Court explicitly rejected. Id. at 1349.

Accordingly, because plaintiff fails to make out a prima facie case, defendant's motion for summary judgment (Dkt. # 50) as to plaintiff's claim for pregnancy discrimination under Title VII is **granted**.

## B. Retaliation

Defendant next argues that it is entitled to summary judgment on plaintiff's claim that defendant retaliated against her in violation of Title VII and the Rehabilitation Act. Dkt. # 50, at 26-29. Plaintiff argues that there are fact questions as to whether defendant retaliated against her. Dkt. # 55, at 23-26.

A prima facie case of retaliation requires a plaintiff to show: (1) she engaged in protected opposition to an unlawful employment practice; (2) she suffered an adverse employment action; and (3) there was a causal connection between the plaintiff's protected opposition and the adverse employment action. Sokari v. Gates, 561 F.3d 1076, 1081 (2009). "A causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive . . . . " O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).

Plaintiff fails to make out a prima facie case of retaliation. Citing no law, plaintiff lists seven events that she argues create fact questions as to whether defendant retaliated against her. Dkt. # 55, at 23-26. The seven arguments plaintiff raises fall into two categories: (1) two arguments that are incomprehensible; and (2) five arguments that are wholly conclusory. Id.

Plaintiff's two incomprehensible retaliation arguments are as follows:

(1) Under the header "The Revocation of an Interim Reasonable Accommodation Can Constitute Evidence of Retaliation," plaintiff states, " [Robin] Jones testified to a detailed memory of Andrew Jones, on February 17, 2015, providing the reasonable accommodation of her answering the telephone . . . . [Plaintiff] now disputes this workout. This is a quintessential jury question requiring a weighing of credibility and precluding summary judgment. Id.

14

(2) Under the header "Disputed Material Facts Exist as to Whether Jones was Asked to Falsify a Federal Document, Such an Act Would Constitute a Terminable Offense, and Such a Request Can Constitute Evidence of Retaliation," plaintiff states, "Jones testified that Joy Franks was instructed by postmaster Ervin-Johnson—after the verbal confrontation—to have Jones fill-out (and falsify) a federal form or clock off. Franks disputes this and claims she never intended Jones to fill-out the federal form on-the-spot. Importatantly [sic], when Franks found out another worker had a high risk pregnancy, Franks merely handed her the light-duty form and requested she return it 'as soon as possible,' and permitted the other employee to work from the time of informing her . . . of her high-risk pregnancy and returning the proper light duty form. Here again, this is a quintessential jury question requiring a weighing of credibility, and thus precludes entry of summary judgment. " Id. at 24-25.

Because these arguments are incomprehensible, they fail.

Plaintiff's five conclusory retaliation arguments are as follows:

(1) "Assuming that Andrew Jones was not required to provide the temporary, interim accommodation to Robin Jones, once the accommodation was doled out Joy Frank's revocation thereof—after Postmaster Ervin-Johnson confronted Jones about her high-risk pregnancy—can constitute evidence of a materially adverse action that would chill a reasonable worker from requesting and then later defending the accommodation she had received." Id. at 24.

(2) "Callison's failure to escalate Jones' [sic] request [to a Reasonable Accommodation Committee] can constitute retaliation." Id. at 25.

(3) "Assuming, arguendo, that Callison was not required to contact the . . . plant to inquire as to whether any available work hours existed, Callison's failure to make a simple phone call or to send an email can constitute evidence of retaliation." Id. at 25

(4) "Jones never verbally or in writing authorized the Defendant to draw her annual leave or sick leave, and the Defendant's drawing her leave under these circumstances can constitute evidence of discrimination [sic]. In addition, the Defendant's wrongful drawing of her annual sick leave was so improper that the Defendant lost a grievance concerning the same. The Defendant, however, never replaced or paid for those hours it lost in the grievance . . . . This unauthorized draw or [sic] annual and sick leave, and the Defendant's failure to pay the grievance it lost can constitute evidence of retaliation." Id. at 26.

(5) "Before returning from maternity leave, Plaintiff called the HR/accounting representative at the USPS and worked out a favorable repayment of the

15

overpayment she incurred . . . . However, Postmaster Ervin-Johnson sent a letter stating the Plaintiff was refusing to pay, and interposed the maximum deductible amount to be withdrawn each pay check. This irregularity of the Postmaster chasing down a run-of-the mill overpayment that had already been worked-out can constitute evidence of retaliation." Id. at 26.

The above five arguments share a common, fatal defect—i.e. in them, plaintiff concludes that a given act of defendant "can constitute retaliation," but fails to explain (1) what the protected opposition was that plaintiff engaged in prior to defendant's act; (2) whether defendant's act resulted in, what the law would consider, an adverse employment action; and (3) whether there is any evidence justifying an inference that retaliatory motive precipitated the adverse employment action. These meritless, unsubstantiated arguments, therefore, fail.

Accordingly, because plaintiff cites no law and her arguments are incoherent or conclusory or both, defendant's motion for summary judgment (Dkt. # 50) as to plaintiff's retaliation claims is **granted**.

**IV.**

In sum, the Court concludes that defendant is entitled to summary judgment on plaintiff's pregnancy discrimination and retaliation claims because plaintiff has failed to establish a prima facie case for either. The Court notes that federal anti-discrimination laws are designed to protect individuals from discrimination in the workplace based on protected characteristics, but are not designed to provide plaintiffs—or their attorneys—a vehicle to pursue meritless federal claims based solely on a plaintiff's membership in a protected class. The Court evaluates all claims equally, but advises attorney Jeffrey D. Jones for the third time in approximately seventeen months,[9] that federal

---

[9] See Ford v. Brennan, 2016 WL 3566864, at *7 (N.D. Okla. June 27, 2016); Pitman v. Am. Airlines, Inc., 2016 WL 3129228, at *12 (N.D. Okla. June 2, 2016), aff'd, 692 Fed. App'x 549 (10th Cir. 2017).

anti-discrimination claims should be based in fact and should not be merely an exercise in checking all the boxes of protected classes to which plaintiff may belong.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 50) is **granted**.

**DATED** this 20th day of November, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE